UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
------------------------------------------------------------X          NOT FOR PUBLICATION
LUIS ALBERTO ALADINO,

                        Petitioner,

            -against-                                         **MEMORANDUM & ORDER**
                                                   09-cv-926 (CBA)

UNITED STATES OF AMERICA,

                        Respondent.
------------------------------------------------------------X
AMON, Chief United States District Judge:

       Luis Alberto Aladino ("Aladino") filed a motion requesting authorization to appeal his

convictions and sentence, which were imposed following his guilty plea to charges in three

different indictments (case numbers 05-cr-519, 06-cr-87, and 06-cr-467).  After giving notice to

Aladino, and upon his consent, the Court construed his motion as a petition for relief pursuant to

28 U.S.C. § 2255 and set a schedule which allowed Aladino to supplement his motion and the

government to respond.  The Court now denies Aladino's § 2255 petition, and also denies his

request for discovery.

**I.      BACKGROUND**

       Aladino is a Colombian national who was charged in three separate indictments, two filed

in the Eastern District of New York and one filed in the District of Massachusetts and transferred

here for disposition by guilty plea.

       **A.  Case number 05-cr-519 (the "E.D.N.Y." indictment)**

       In January 2005, an informant working with the Drug Enforcement Administration

("DEA") contacted Aladino in Colombia by telephone and discussed a possible heroin purchase.

(See Gov't Opp., Ex. A, Presentence Investigation Report ("PSR") at ¶ 13.)  In March 2005, after

-1-

several telephone conversations, Aladino arranged for the informant to meet with another individual in Queens, New York to view a sample of the heroin. (Id.)  Aladino and the informant then agreed to a sale of 10 kilograms of heroin, although none was actually purchased during the investigation. (Id.)  Aladino also asked the informant to assist him with collecting money from delinquent customers. (Id. at ¶ 14.)

Based on the foregoing facts, Aladino was indicted in this district on July 7, 2005, and charged with conspiracy to distribute and possess with intent to distribute one kilogram or more heroin, in violation of 21 U.S.C. §§ 846 and 841(b)(1)(A)(i). The stated time period for this conspiracy was January 2005 through July 2005.  The informant thereafter arranged a meeting with Aladino in the Dominican Republic for additional discussions.  Aladino traveled to the Dominican Republic to meet with the informant, and DEA agents ultimately arrested Aladino there. (Id. ¶ 15.)  Aladino claims to have been detained by the Dominican authorities for approximately seven days prior to his transfer to the United States, where he was arraigned on July 19, 2005.  (See case no. 05-cr-519, docket entry # 3.)

Upon arriving in the United States, Aladino immediately began cooperating with the government.  At that time, Aladino appears to have been providing information that the government considered valuable, and the parties were in the process of formalizing a cooperation agreement that would have entitled Aladino to a U.S.S.G. § 5K1.1 letter at sentencing.  However, these plans for a cooperation agreement were abandoned, at least for the time being, when the conduct underlying Aladino's second indictment surfaced.

### B.  Case number 06-cr-87 (the "Queens Correctional" indictment)

Upon arriving in the United States, Aladino was housed at the Queens Private Correctional Facility ("QPCF") in New York.  (PSR at¶ 16.) While incarcerated at the QPCF, Aladino conspired with an informant to conduct narcotics transactions with three groups of co-conspirators outside the facility. (Id. at ¶¶ 16-23.) For each transaction, Aladino pre-arranged meetings between a second informant and the groups of co-conspirators. (Id.)  Aladino's co-conspirators were arrested after meeting with the informant to negotiate the transactions and taking steps toward purchasing the narcotics. (Id.)

Aladino was indicted on March 10, 2006 and charged in a three-count superseding indictment for his role in the three QPCF conspiracies. Each count of the superseding indictment charged Aladino with conspiracy to distribute and possess with intent to distribute five kilograms or more of cocaine, in violation of 21 U.S.C. §§ 846 and 841(b)(1)(A)(ii)(II). Aladino was the only defendant charged in all three conspiracies, the time frames for which were October 26, 2005 through January 12, 2006, October 26, 2005 through January 25, 2006 and October 26, 2005 and February 15, 2006, respectively.

### C.  Case number 06-cr-467 (the "D. Mass" indictment)

Prior to Aladino's indictment and arrest in case number 05-cr-519 (E.D.N.Y.), Aladino had already been indicted on March 2, 2005 in the District of Massachusetts after an investigation revealed that he was a heroin supplier residing in Colombia, whose heroin had been trafficked into Boston. (PSR at ¶ 3). He was charged with conspiracy to distribute and possess with intent to distribute one kilogram or more of heroin, in violation of 21 U.S.C. §§ 846 and

841(b)(1)(A)(i). The stated time period for this conspiracy was December 2003 through approximately January 2005.

On June 27, 2006, Aladino consented to a transfer of the indictment from the District of Massachusetts to this district for plea and sentence pursuant to Federal Rule of Criminal Procedure 20. This case was thus filed in the Eastern District of New York on July 17, 2006.

### D.  The Plea Agreement and Sentence

On July 17, 2006, Aladino resolved all three criminal cases by pleading guilty pursuant to a plea agreement with the government. (Gov't Opp., Ex. I.)   Aladino agreed to plead guilty to the indictment in 05-CR-519 (E.D.N.Y.), to Count One of the indictment in 06-CR-87 (Queens Correctional), and Count One of the indictment in 06-CR-467 (D. Mass.).  (Id. at 1.) Each of these charges carried a maximum sentence of life imprisonment, a minimum sentence of ten years imprisonment, and a minimum term of supervised release of five years. (PSR at 18-19.)

The plea agreement estimated that Aladino's total offense level under the Sentencing Guidelines was a level 35. (Gov't Opp., Ex. I, at 5.)  With a Criminal History Category of III, this level corresponded to a sentencing range of 210 to 262 months. (Id.)  Aladino also consented in the plea agreement to forfeit $270,000 seized by the DEA.  (Id. at 6-7.)  Notably, the plea agreement provided that the defendant agreed "not to file an appeal or otherwise challenge by petition pursuant to 28 U.S.C. § 2255 or any other provision the conviction or sentence in the event that the Court imposes a term of imprisonment of 262 months or below." (Id. at 5.)  The plea agreement further stated that "[t]his waiver is binding without regard to the sentencing analysis used by the Court." (Id. at 5-6.)  On July 17, 2006, Aladino pleaded guilty pursuant to this agreement.  (Gov't Opp., Ex. D, Transcript of Guilty Plea, July 17, 2006.)

-4-

On September 14, 2007, the parties appeared before this Court for sentencing.  Based on a guidelines range of 210 to 262 months, this Court sentenced Aladino to 220 months in prison.  (Gov't Opp., Ex. E, Transcript of Sentencing, Sept. 14, 2007.)

It appears that following the Queens Correctional indictment and the plea agreement, and even after sentencing, Aladino continued to provide information to the government, and he and his attorney were hopeful that this assistance would later lead to a motion to reduce his sentence pursuant to Rule 35 of the Federal Rules of Criminal Procedure.  However, to date, no Rule 35 motion has been filed.

### E.  The § 2255 Petition

In his § 2255 submissions, Aladino asserts various defects in his criminal proceedings, guilty plea, and legal representation, all of which were initially framed as claims of ineffective assistance of counsel.  (See Pet. Supp., docket entry #4, at 5-10, Ex. 1 at 4.)  In particular, Aladino asserted in his original petition that his attorney was ineffective because he failed:  (1) to file a timely direct appeal, despite Aladino's request that he do so; (2) to file motions to dismiss the E.D.N.Y. and D. Mass indictments on the grounds that Aladino's arrest, detention, and transfer to the United States were unlawful; (3) to move to dismiss the E.D.N.Y. indictment on the grounds that Aladino was the only named conspirator; (4) to move to dismiss the Queens Correctional indictment on the grounds that the government never recovered any narcotics; and (5) to move to dismiss the D. Mass indictment on the grounds that it lacked the Grand Jury foreperson's signature.  Aladino's reply papers also make scattered assertions that his guilty plea was not knowing and voluntary, that there was insufficient evidence of his guilt, and that he was

entrapped into committing the crimes charged in the E.D.N.Y. and Queens Correctional

indictments.  He also takes issue with various aspects of his plea agreement, PSR, and sentence.

      In opposition, the government argues, inter alia, that: (1) the Court should credit the

account provided by Aladino's trial counsel, who claims that Aladino did not request a timely

direct appeal; (2) any claims related to case numbers 05-cr-519 and 06-cr-87 are time-barred; (3)

Aladino's claims are barred by his guilty plea and the waiver of collateral review contained in his

plea agreement; and (4) the claims are without merit.

## II.    DISCUSSION

### A.  Ineffective Assistance of Counsel

#### 1.  Failure to File A Direct Appeal

      Aladino's claim related to his counsel's failure to file a direct appeal must be addressed at

the outset, as it bears on many of the other issues presented in the petition.  Specifically, Aladino

alleges that he was deprived of the effective assistance of counsel because, beginning on the day

after his sentencing, he asked his attorney, Paul J. Madden, to file an appeal on his behalf, but

Mr. Madden failed to do so.  Aladino acknowledges that this Court reminded him at sentencing

that he had 10 days to file a notice of direct appeal, and claims that the next day he wrote to Mr.

Madden asking him to file an appeal.  He also claims that over the next several months, he wrote

several letters to Mr. Madden inquiring about whether an appeal had been filed.  Aladino claims

that he received a response from Mr. Madden after two months, which he understood to be

informing him that he could still file a late notice of appeal.  (Pet. Reply, Ex. 2, at 2.)  Aladino

alleges that his other letters prompted either no response from Mr. Madden, or a response that

did not address the appeal issue.  Aladino has provided two letters, dated July 17 and October 7,

2008, allegedly written by him to Mr. Madden, which inquire about whether an appeal was filed. He has not provided any of the responses from Mr. Madden that he claims to have received. (Pet. Motion Requesting Authorization to Appeal, Oct. 31, 2008, Ex. 2; Pet. Reply, Ex. 2, 3.)

The government appears to agree that these allegations, if true, would meet the standards of ineffective assistance, and Aladino would be newly entitled to a direct appeal without any showing that his claims on appeal would have merit.  See Campusano v. United States, 442 F.3d 770 (2d Cir. 2006).  This conclusion holds true notwithstanding the fact that Aladino's plea agreement contained an appeal waiver.  As the Second Circuit has squarely held:

> [E]ven after a waiver, a lawyer who believes the requested appeal would be frivolous is bound to file the notice of appeal and submit a brief pursuant to Anders v. California, 386 U.S. 738 (1967). When counsel fails to do so, we will presume prejudice, as required by Roe v. Flores–Ortega, 528 U.S. 470 (2000), and the defendant will be entitled to a direct appeal without any showing on collateral review that his appeal will likely have merit.

Campusano, 442 F.3d at 771-72.

Campusano directs that, when faced with such a claim in a § 2255 petition, a district court should hold a hearing to determine the issue of whether the client in fact requested the appeal. Id. at 776.  "[T]he district court has discretion to determine if a testimonial hearing will be conducted," id., or if the matter can be resolved by "expand[ing] the record" and deciding on the basis of documentary submissions, Chang v. United States, 250 F.3d 79, 85 (2d Cir. 2001). In the latter scenario, the record is properly supplemented with a "detailed affidavit from trial counsel" describing the circumstances surrounding the decision not to file an appeal.  Id.  Courts in this district have repeatedly reviewed these types of ineffective assistance claims without an evidentiary hearing, but rather on the basis of the petitioner's submissions and an affidavit from

-7-

the trial attorney.  See United States v. Williams, 2009 WL 1162382, at *3 (S.D.N.Y. 2009);

Riggi v. United States, 2007 WL 2245595, at *9 (S.D.N.Y. 2009) (collecting cases).

On December 8, 2011, this Court issued an order finding that Aladino's allegations of

ineffective assistance contained an implied waiver of the attorney-client privilege, and directing

Mr. Madden to file an affidavit in response.  (Docket entry # 19.)  Mr. Madden complied on

January 30, 2012.  (Docket entry # 21.)  In this affidavit, Mr. Madden states that, even after the

conduct underlying the Queens Correctional indictment was brought to light, Aladino was "left

to continue to be hopeful" that he could continue to provide information to the Government and

later receive a Rule 35 motion to reduce his sentence.  (Madden Aff. at 3.)  Mr. Madden states

that he discussed this matter with the government and was told that it would be difficult to

continue working with Aladino while an appeal was pending.  Mr. Madden remarks that he "did

not take it that the government was trying to dissuade Mr. Aladino from his right to pursue an

appeal, but more likely it was awkward and did not seem to be workable."  (Id.)  Mr. Madden

continues: "I discussed this with Mr. Aladino, i.e., the options of [the] Rule 35 avenue versus the

appeal route.  I explained and advised him and he agreed that the Rule 35 avenue was the better

option to proceed with and more likely to lead a more favorable result."  (Id.)  Mr. Madden also

notes that based on Aladino's past proffer sessions, it "seemed . . . that there was a reasonable

and strong possibility that he would be able to provide substantial assistance post-sentence."

(Id.)  Mr. Madden states that he discussed these matters with Aladino "at or around the

sentencing proceeding," that Aladino agreed that he was better off not filing an appeal, and that

Mr. Madden "followed his instructions and did not file a notice of appeal so as to protect him

and not jeopardize his options."  (Id.)

Mr. Madden describes how he attempted to facilitate further cooperation between Aladino and the government following sentencing, but that the efforts were not successful, owing in part to turnover of Assistant United States Attorneys at the office.  Mr. Madden states that he then informed Aladino that he was "no longer optimistic" about obtaining a Rule 35 motion, but that he would "continue to try."  (Id. at 4.)  Mr. Madden claims that sometime after this last correspondence, he learned that Aladino had filed the instant petition claiming ineffective assistance of counsel.  Mr. Madden claims that he was "surprised" because they had a "good attorney-client relationship," and Mr. Madden believed that over the course of their many meetings, he had kept Aladino fully informed of all his rights and options at every stage of the proceedings.  (Id.)

Mr. Madden also responds to Aladino's claim that he wrote his attorney a letter the day after sentencing asking him to a file a notice of appeal.  Mr. Madden states that he received a letter from Aladino around September 19, 2007 that "expressed dismay with [his] sentence" and "asked me what he had to do to qualify for Rule 35."  (Id.)  In this letter, Aladino stated that because the AUSA had not discussed Rule 35 at sentencing, he was concerned that he would never receive such a motion.  Aladino also asked Mr. Madden to try to keep him at the Metropolitan Detention Center to facilitate further meetings with the government, rather than transfer him immediately to the BOP facility in Coleman, Florida where he had requested to serve out his sentence.  Mr. Madden recounts that in this letter, Aladino expressed that he "felt that if he was moved out of the MDC his chances to cooperate would be reduced.  If that happened he wanted to know what time he had to make an appeal."  (Id. at 4.)  Mr. Madden indicates that following this letter he spoke to the AUSA on the case, who stated that Aladino's

transfer to Coleman would not impede further cooperation, and that the federal agents who would wish to speak to him were located in Miami, Florida.  Mr. Madden did not interpret Aladino's letter as altering his desire to proceed with attempts to procure a Rule 35 motion rather than pursue a direct appeal.  To that end, Mr. Madden concludes:  "Given his decision to me to proceed with the Rule 35 path and not the appeal route, I received a follow up letter from my client later in the month [in] which he provided details and information about continuing criminal activity of others which he thought would be important and helpful to the government." (Id. at 5.)  In this letter, Aladino again expressed his desire to be kept at the MDC, and "focused completely on Rule 35 and . . . did not mention appeal nor . . . request that [Mr. Madden] file a notice of appeal."  (Id.)  Mr. Madden passed along the information to the government and continued to try to keep Aladino at the MDC, but appears to have been ultimately unsuccessful. Aladino is now at Coleman and has not secured a Rule 35 motion.

        Based on the above submissions, the Court believes that resolution of this matter does not require an evidentiary hearing, and that Aladino has not carried his burden of demonstrating that his attorney failed to file a requested appeal.  See Lebron v. United States, 2007 WL 1159646, at *4 (S.D.N.Y. 2007); Lopez v. United States, 2006 WL 2020389, at *2 (S.D.N.Y. 2006).  To begin with, Aladino signed a plea agreement that contained an appeal waiver, and he stated that he understood that provision of the agreement.  (Tr. 7/17/06, at 29-30.)  Mr. Madden's affirmation convincingly describes a process leading up to sentencing whereby Aladino, in consultation with his attorney, made a calculated decision to pursue further cooperation with the government rather than a direct appeal (the latter option facing the difficulty of the appeal waiver, among others).  Mr. Madden's account indicates that, at most, Aladino later became

dismayed at the doubts surrounding Rule 35 prospects, and inquired about the possibility of an out-of-time appeal if and when he was eventually moved down to Coleman, Florida.  The Court credits Mr. Madden's assertions that Aladino never in fact requested that a timely appeal be filed but wanted first and foremost to engage in further cooperation.  Indeed, that was not an unreasonable route to have taken at the time, or for Mr. Madden to have recommended, given the strength of the government's evidence against Aladino in all three cases, which would likely have included several recorded telephone calls involving Aladino and testimony from multiple informants.

Aladino's version of the events also suffers from its own credibility problems, apart from Mr. Madden's contradictory account.  For example, if Aladino, as he claims, always intended to file a direct appeal, and was admittedly aware of the 10-day time limit, it would make little sense to wait until the day after sentencing to mail a letter to his attorney requesting an appeal, rather than discuss the matter in person at the sentencing proceeding itself.  Aladino also fails to provide any corroborative evidence for his assertion that he timely requested that his attorney file an appeal.  All he provides are two letters he claims to have sent to his attorney in July and October 2008, long after the time for filing an appeal had expired.  (See Pet. Mot., Ex. 2; Pet. Reply, Ex. 3.)  It is additionally of note that Aladino has not responded to the account provided by Mr. Madden's own affidavit which was mailed to him in January 2012.  (Madden Aff. at 5.)

The record establishes only that Aladino's ultimate inability to obtain Rule 35 relief has led him to mischaracterize his previous interactions with counsel under a rather misguided belief that he would have faced a different outcome if he had pursued a direct appeal.  Thus, the Court

concludes that Aladino voluntarily forfeited his right to a direct appeal, and any claim of ineffective assistance on those grounds is denied.[1]

## 2.  Aladino's Guilty Plea

Aladino's submissions make scattered assertions that his plea was not voluntary, based essentially on two sets of allegations:  (1) that his attorney pressured him, deceived him, or otherwise did not represent him effectively during the plea agreement process and at his plea allocution[2]; and (2) that his alleged unlawful detention in the Dominican Republic for seven days prior to his transfer to the United States undermined the voluntariness of his later guilty plea. (See Pet. Reply, at 13 & Ex. 1).  The first claim is refuted by the record of the plea proceeding, and the second is totally without support since Aladino's plea was a year after the alleged detention.

"The longstanding test for determining the validity of a guilty plea is 'whether the plea represents a voluntary and intelligent choice among the alternative courses of action open to the defendant.'"  Hill v. Lockhart, 474 U.S. 52, 56 (1985) (quoting North Carolina v. Alford, 400 U.S. 25, 31 (1970)).  To evaluate a claim that a guilty plea was not knowing or voluntary due to ineffective assistance of counsel, the Court uses the familiar framework established in Strickland v. Washington, 466 U.S. 668 (1984). To prevail on such a claim, a defendant must show (1) that counsel's representation was deficient, meaning that it "fell below an objective standard of reasonableness"; and (2) "a reasonable probability that but for counsel's unprofessional errors, the result of the proceeding would have been different."  Strickland, 466 U.S. at 694.  Under the

---

[1] To the extent Aladino might argue that this Court should nonetheless authorize him to take an untimely direct appeal at this time, the Court denies such a request.  Aladino's decision to pursue cooperation following his conviction does not constitute appropriate grounds for extending or tolling the time for taking an appeal.

[2] As to this claim, Aladino appears to assert that during the plea process Mr. Madden, in conjunction with the government, tricked him into incriminating himself, offered false promises of future sentencing leniency, and pressured Aladino into misrepresenting or overstating his culpability in his plea agreement and at his allocution.

first prong, courts must be "highly deferential" to counsel's performance, and must "indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." Id. at 689.  "Where, as here, a defendant is represented by counsel during the plea process and enters his plea upon the advice of counsel, the voluntariness of the plea depends on whether counsel's advice 'was within the range of competence demanded of attorneys in criminal cases.'" Hill, 474 U.S. at 56 (quoting McMann v. Richardson, 397 U.S. 759, 771 (1970)).  To satisfy the prejudice prong, the defendant must show "that there is a reasonable probability that, but for counsel's errors, he would not have pleaded guilty and would have insisted on going to trial." Id. at 59; see Padilla v. Kentucky, 130 S. Ct. 1473, 1485 (2010) ("[T]o obtain relief on this type of [Strickland] claim, a petitioner must convince the court that a decision to reject the plea bargain would have been rational under the circumstances.").

To begin with, Aladino's current self-serving assertions of involuntariness or attorney coercion are firmly undermined by his own allocution at both his plea before the magistrate, and at sentencing.  "This testimony carries such a strong presumption of accuracy that a district court does not, absent a substantial reason to find otherwise, abuse its discretion in discrediting later self-serving and contradictory testimony as to whether a plea was knowingly and intelligently made." United States v. Juncal, 245 F.3d 166, 171 (2d Cir. 2001) (citing Blackledge v. Allison, 431 U.S. 63, 74 (1977)).  A court is "entitled to rely upon the defendant's sworn statements, made in open court with the assistance of a translator, that he understood the consequences of his plea, had discussed the plea with his attorney, knew that he could not withdraw the plea, understood that he was waiving his right to appeal a sentence below [a certain number of months], and had been made no promises except those contained in the plea agreement." United

States v. Hernandez, 242 F.3d 110, 112 (2d Cir. 2001); see also United States v. DeJesus, 219 F.3d 117, 121 (2d Cir. 2000) (rejecting the defendant's assertion that he did not knowingly waive his right to appeal in his plea agreement because that contention was inconsistent with his statements during the plea colloquy), United States v. Torres, 129 F.3d 710, 715 (2d Cir.1997) ("A defendant's bald statements that simply contradict what he said at his plea allocution are not sufficient grounds to withdraw the guilty plea.").

On July 17, 2006, Aladino gave a lengthy plea allocution under oath with the assistance of an interpreter.  (See Tr. 7/17/06.)  Each charge was explained to him, and Aladino affirmed that he understood those charges against him.  (Id. at 8-13.)  He also stated that he had experienced no difficulty communicating with his attorney and was satisfied to have Mr. Madden represent him.  (Id. at 6, 9.)  He was given a detailed explanation of the rights that he was giving up by pleading guilty, and he affirmed that he understood and was agreeing to give up those rights.  (Id. at 16.)  Aladino also affirmed that he had reviewed the plea agreement with his attorney, that he understood what it said, and that no other promises had been made to him.  (Id. at 16-17.)  Aladino's attorney also stated that he, "along with another Spanish interpreter, reviewed [the plea agreement] at least twice with [Aladino] word for word," which Aladino confirmed.  (Id. at 16.)  Aladino further stated that he understood that pursuant to the agreement, his sentencing guideline range would likely fall between 210 and 262 months in prison, and that his guideline sentence would be calculated based on drug quantities of nine kilograms of heroin, and twenty kilograms of cocaine.  (Id. at 21-26.)  He was reminded by the Court that "in the Plea Agreement you've agreed that you will not file an appeal or otherwise challenge your conviction or your sentence so long as the Court imposes a term of imprisonment of 262 months or less.  Do

you understand that you've agreed to that?"  Aladino responded, "Yes, Your Honor."  (Id. at 29-30.)  Finally, after Aladino gave his guilty pleas, he affirmed that they were made voluntarily, and were not the product of any threats or promises.  (Id. at 30-31.)

With respect to indictment number 05-cr-519, Aladino allocuted that that he "conspired with other people to distribute heroin here in New York and [he] was in Colombia," and that the offense involved over one kilogram.  (Id. at 31.)  With respect to indictment number 06-cr-87, Aladino stated that he "agreed with another person in jail to do a cocaine business" and that he facilitated a transaction of over 20 kilograms of cocaine.  (Id. at 32-33.)  Finally, with respect to indictment number 06-cr-467, Aladino stated that he agreed to distribute heroin to a friend in New York who later took those drugs to Massachusetts.  (Id. at 35-36.)

Aladino appeared before this Court on September 14, 2007 for sentencing.  There, the Court again asked Aladino, who had been sworn under oath, "do you still wish to give up all of those rights as you stated on the record before [the magistrate] that you did?"  Aladino confirmed, "Yes, Your Honor."  (Tr. 9/14/07, at 27.)  This Court at that time wished to clarify part of the allocution, having noted that the conspiracies in the E.D.N.Y. and D. Mass. indictments overlapped by a month and needed to be established as separate conspiracies.  (Id. at 4-5.)  Aladino explained that while both conspiracies involved a man named Jose Rodriguez, the two conspiracies were "completely separate" and involved "different groups of people and different agreements."  (Id. at 33.)  The Court also clarified that the parties had agreed that Aladino's total offense level under the sentencing guidelines would be 35, carrying a range of imprisonment of 210 to 262 months.  (Id. at 18-23, 35.)  With the additional allocution provided by the defendant, the Court accepted the pleas to the charges contained in all three indictments.

(Id. at 34.)  The defendant confirmed once again that he was satisfied with the services of his

counsel, Mr. Madden.  (Id. at 35.)  The Court then sentenced Aladino to 220 months in prison for

each of the indictments, to run concurrently.  (Id. at 57-58.)

  The Court concludes that all of the testimony above, that took place in two separate court

appearances over a year apart, undermines any claim that Aladino did not knowingly and

voluntarily plead guilty to the three charges, or did not agree to the terms of the plea agreement,

including the waiver of an appeal and collateral review.

  The Court is not persuaded by Aladino's current assertions that his counsel did not

effectively represent him during the plea agreement process, that he was tricked or pressured into

agreeing to certain terms in the agreement, or that his attorney told him to lie at his allocution.

Aladino had multiple opportunities to inform the Court of any problems with the plea agreement,

and instead made detailed affirmations under oath that he understood the agreement, was

satisfied with his legal representation, and was guilty of all three charges.  In receiving a

sentence of 220 months in prison, Aladino obtained exactly what he bargained for, and indeed,

through his plea agreement, was able to avoid many more charges with much higher penalties.

Aladino has failed to establish that his attorney provided deficient representation during the plea

process.

  Moreover, the Court does not believe that Aladino has demonstrated prejudice resulting

from any deficient advice he received.  In particular, he has not provided any reasonable or

credible indication that, absent the alleged defects in his representation, he would have decided

to plead not guilty and to proceed to trial.  Rather, the record indicates that the government

possessed strong evidence of Aladino's involvement in multiple drug conspiracies, and that, in light of his exposure, Aladino obtained a very favorable plea agreement and sentence.

Regarding Aladino's allegation that the conditions of his detention in the Dominican Republic undermined the voluntariness of his later plea, it is important to observe that he did not plead guilty until a full year after his arrest in the Dominican Republic, and was represented by counsel from his initial arrival in this county in July 2005. The Court finds credible Mr. Madden's assertions that he provided Aladino with diligent representation throughout the proceedings, and kept him fully informed of all his rights and defenses. Moreover, the record indicates that from the very beginning of this case, Aladino was eager to cooperate with government agents and continued in his desire to cooperate through and after sentencing. This fact undermines his assertions that he was somehow coerced by events that allegedly took place a year before his guilty plea.

The Court thus concludes that Aladino has not demonstrated that ineffective assistance of counsel or any other surrounding circumstances rendered his plea involuntary.

### 3. Other Claims of Ineffective Assistance

Aladino's claims of ineffective assistance of counsel that are unrelated to the voluntariness of his guilty plea—such as claims that his attorney should have filed various motions to challenge the government's evidence, to dismiss the indictments against him, or to obtain a lower sentence—are barred for one (or both) of two reasons: his guilty plea waived all non-jurisdictional defects in the proceedings leading up to that plea, and his plea agreement contained a waiver of collateral review.

-17-

"A defendant who pleads guilty unconditionally while represented by counsel may not assert independent claims relating to events occurring prior to the entry of the guilty plea. 'He may only attack the voluntary and intelligent character of the guilty plea by showing that the advice he received from counsel was not within [acceptable] standards.'" United States v. Coffin, 76 F.3d 494, 497(2d Cir. 1996) (quoting Tollett v. Henderson, 411 U.S. 258, 267 (1973)); see United States v. Garcia, 339 F.3d 116, 117 (2d Cir. 2003) ("It is well settled that a defendant who knowingly and voluntarily enters a guilty plea waives all non-jurisdictional defects in the prior proceedings."). This bar applies as well to "ineffective assistance claims relating to events prior to the guilty plea." Coffin, 76 F.3d at 498; see Prousalis v. United States, 2007 WL 2438422, at *9 (S.D.N.Y. 2007).   Accordingly, by voluntarily pleading guilty, Aladino forfeited his right to bring claims premised on actions his counsel should have taken prior to the plea process.

Moreover, in his plea agreement, Aladino agreed "not to file an appeal or otherwise challenge by petition pursuant to 28 U.S.C. § 2255 or any other provision the conviction or sentence in the vent that the Court imposes a term of imprisonment of 262 months or below." (Gov't Opp. Ex. I, at 5.)  Aladino specifically affirmed that he understood this portion of the plea agreement during his allocution.  (See Tr. 7/17/06, at 29-30.)  It is well-settled that a defendant's agreement to waive his rights to appeal and to collateral review is enforceable so long as the record contains sufficient evidence to establish that the plea agreement was entered into knowingly and voluntarily.  See United States v. Morgan, 386 F.3d 376, 378-80 (2d Cir. 2004); Garcia-Santos v. United States, 273 F.3d 506, 508 (2d Cir. 2001); United States v. Hernandez, 242 F.3d 110, 113-14 (2d Cir. 2001) (appeal waiver in plea agreement "only allows appellate

-18-

review of the constitutionality of the process by which the plea agreement was consummated");
United States v. Rosa, 123 F.3d 94, 97 (2d Cir.1997). Such a waiver "applies to grounds that
arise after, as well as before, [the defendant] made the waiver," including claims related to the
defendant's sentencing. Garcia-Santos, 273 F.3d at 509. It also applies to claims framed as
ineffective assistance of counsel that are unrelated to the plea process. Parisi v. United States,
529 F.3d 134, 138-39 (2d Cir. 2008); see Garcia-Santos, 273 F.3d at 508-09. By voluntarily
entering into his plea agreement, Aladino thus affirmatively waived his right to bring any claims
in the instant petition that are unrelated to his guilty plea, including sentencing claims that arose
after that plea.

Accordingly, Aladino's guilty plea and plea agreement, both of which the Court has
concluded were knowingly and voluntarily made, foreclose the remaining ineffective assistance
claims in his petition.

### B. Freestanding Claims of Error

Insofar as Aladino attempts to frame any of the claims in his submissions as freestanding
claims of legal error, rather than claims of ineffective assistance of counsel, they are likewise
barred by his guilty plea and waiver of collateral review, for the reasons stated above.

To the extent Aladino's claims that he was not properly extradited from the Dominican
Republic or that the indictments against him did not contain requisite formalities can be
construed as challenges to this Court's jurisdiction, which would not be precluded by his guilty
plea, the Court finds them to be without merit.

By its own terms, the Convention between the United States and the Dominican Republic
for the Extradition of Criminals does not cover non-citizens of the Dominican Republic, charged

-19-

with narcotics offenses, who were not physically present in either of the party countries when they committed their crimes.  See Convention For the Mutual Extradition of Fugitives from Justice, U.S. – Dominican Republic, August 2, 1910, 36 Stat. 2468, art. I, II, VIII.  Moreover, "[a]n extradition treaty often is not the exclusive method by which the United States can obtain custody of a foreign citizen . . . .  Absent an express prohibition [in the treaty], . . . a government may obtain custody of a defendant by other methods, including abduction, expulsion, or surrender by the host country."  United States v. Gariner, 279 Fed. App'x 848, 850 (11th Cir. 2008) (citing Ker v. Illinois, 119 U.S. 436, 438, 442-43 (1886)) (rejecting similar claim based on U.S. Convention with Dominican Republic).  Thus, because Aladino has not demonstrated that an express agreement between the United States and the Dominican Republic prohibited federal agents from seizing him in the Dominican Republic, the method by which he was brought to the United States did not deprive this Court of jurisdiction over his criminal cases.  Id.; see United States v. Alvarez-Machain, 504 U.S. 655, 662 (1992) ("If we conclude that the Treaty does not prohibit respondent's abduction, the rule in Ker applies, and the court need not inquire as to how respondent came before it.").

Insofar as Aladino alleges that the indictments against him were defective because they did not contain the signature of the Grand Jury foreperson or did not name his co-conspirators, theses contentions are plainly meritless.  While Aladino may have received redacted copies during his case, the courthouse files contain the unredacted, unsealed versions of the indictments with foreperson signatures and co-conspirator identities.  (See Gov't Opp., Ex. F, G, H; Gov't Opp. to Discovery, Ex. A, B, C.)

-20-

Accordingly, any freestanding claims of error are barred by Aladino's guilty plea, and he fails to establish any defect in this Court's jurisdiction.

### C. Timeliness of the Petition

The Court will observe in closing that a sizeable portion of Aladino's petition also faces a timeliness problem. A § 2255 petition must be filed within a one-year limitations period that runs from the latest of the following dates:

(1) the date on which the judgment of conviction becomes final;

(2) the date on which the impediment to making a motion created by governmental action in violation of the Constitution or laws of the United States is removed, if the movant was prevented from making a motion by such governmental action;

(3) the date on which the right asserted was initially recognized by the Supreme Court, if that right has been newly recognized by the Supreme Court and made retroactively applicable to cases on collateral review; or

(4) the date on which the facts supporting the claim or claims presented could have been discovered through the exercise of due diligence.

28 U.S.C. § 2255(f). Aladino does not allege any facts or claims that relate to subsections (2) through (4), and thus subsection (1) is controlling.

Where, as here, the petitioner did not file a direct appeal, his conviction is considered final when the time for filing a direct appeal expires. See Moshier v. United States, 402 F.3d 116, 118 (2d Cir. 2005). At the time of Aladino's conviction in 2007, the time for filing a direct appeal was ten days after the judgment is entered, excluding weekends and holidays. See, e.g., Micali v. United States, 2007 WL 2437692, at *1 (E.D.N.Y. 2007). The judgments of conviction in case numbers 05-cr-519 (E.D.N.Y.) and 06-cr-87 (Queens Correctional) were entered on September 26, 2007. These convictions thus became final when no appeal was filed by October

-21-

11, 2007, and any § 2255 petition after October 11, 2008 is untimely.  The remaining judgment
of conviction, in case number 06-cr-467 (D. Mass.), was entered on October 17, 2007 and
became final on October 31, 2007.  Aladino's initial motion for post-conviction relief is dated
October 27, 2008, and thus is only timely with respect to the last conviction, in case number 06-
cr-467.

Aladino appears to argue in his reply that equitable tolling should render all his claims
timely, however his arguments must fail.  "[A] district court may grant an extension of time to
file a motion pursuant to section 2255 only if (1) the moving party requests the extension upon
or after filing an actual section 2255 motion, and (2) 'rare and exceptional' circumstances
warrant equitably tolling the limitations period."  Green v. United States, 260 F.3d 78, 82-83 (2d
Cir. 2001) (quoting Smith v. McGinnis, 208 F.3d 13, 17 (2d Cir. 2000)).  To warrant equitable
tolling, the petitioner must demonstrate "(1) that he has been pursuing his rights diligently, and
(2) that some extraordinary circumstance stood in his way."  Pace v. DiGuglielmo, 544 U.S.
408, 418 (2005).

Here, Aladino can meet neither prong of the equitable tolling inquiry.  Aladino's only
explanations for his delay in filing a § 2255 petition are that his attorney failed to file a direct
appeal (a claim rejected above), and that Aladino's "lack of knowledge of the [E]nglish
Language, and his extreme poverty stood in his way."  (Pet. Reply at 30.)  He does not allege
that he ever asked his attorney to file a § 2255 petition, and there is no other impediment that
would have prevented him from filing such a petition within the one-year limitations period.  Cf.
Dillon v. Conway, 642 F.3d 358, 363-64 (2d Cir. 2011) (where attorney disregards express
directions to file a habeas petition, and petitioner makes significant efforts to pursue that

-22-

petition, equitable tolling may be appropriate).  "[P]etitioners often are fully capable of

preparing and filing their habeas petitions pro se, and pro se status does not in itself constitute

an extraordinary circumstance meriting tolling."  Doe v. Menefee, 391 F.3d 147, 175 (2d Cir.

2004).  Moreover, even if Aladino's attorney had disregarded his instructions regarding a direct

appeal, once the 10-day time limit for filing a notice of appeal had passed, Aladino still had a

full year to pursue his rights by way of a § 2255 petition, exactly as he did here.  Thus, he has

not demonstrated that he made diligent efforts to file a timely petition, or that extraordinary

circumstances stood in his way

       The Court thus concludes that any claims specific to case numbers 05-cr-519 (E.D.N.Y.)

and 06-cr-87 (Queens Correctional) are untimely, including:  the challenge to the legal

sufficiency of the conspiracy charged in the E.D.N.Y. indictment; the challenge to Queens

Correctional indictment based on the fact that no actual drugs were recovered; the claims that

Aladino was entrapped into committing the crimes charged in those indictments; and any

challenges to Aladino's sentences on those indictments.

       **D.  Aladino's Motion for Discovery**

       Aladino has also filed a motion requesting certain discovery materials, which is denied.

(See docket entry #13.)  "A habeas petitioner, unlike the usual civil litigant in federal court, is

not entitled to discovery as a matter of ordinary course."  Bracy v. Gramley, 520 U.S. 899, 904

(1997); see Cardoso v. United States, 642 F. Supp. 2d 251, 265 (S.D.N.Y. 2009).  Rule 6 of the

Rules Governing Section 2254 and 2255 Cases in the United States District Courts provides that

a "judge may, for good cause, authorize a party to conduct discovery under the Federal Rules of

Civil Procedure and may limit the extent of discovery."  The "good cause" standard requires the

petitioner to present "specific allegations [that] show reason to believe that the petitioner may, if the facts are fully developed, be able to demonstrate that he is . . . entitled to relief." <u>Bracy</u>, 520 U.S. at 908-09 (quoting <u>Harris v. Nelson</u>, 394 U.S. 286, 300 (1969)).

Because the Court has already concluded that Aladino's challenges to the formalities of the indictments are baseless, he has not shown good cause for obtaining the grand jury minutes from those proceedings.  As to his request for the government's wiretapping evidence, Aladino offers no explanation for why he is entitled to these materials or what they might establish. Thus, the motion for discovery is denied.

## III.   CONCLUSION

For the foregoing reasons, Aladino's § 2255 petition is denied.  No certificate of appealability shall issue because there has been no "substantial showing of the denial of a constitutional right."  28 U.S.C. § 2253(c).

SO ORDERED.


_____/s/_____
Carol Bagley Amon
Chief United States District Judge

Dated:  Brooklyn, New York
        August 15, 2012

-24-